UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
No. 08-CR-364 (RHK/AJB)

---

UNITED STATES OF AMERICA,

Plaintiff,

vs.

THOMAS JOSEPH PETTERS,

Defendant.

**DEFENDANT'S POSITION WITH RESPECT TO SENTENCING FACTORS**

---

Defendant Thomas Joseph Petters, by and through his undersigned attorneys, in accordance with D. Minn. L.R. 83.10, takes the following position with respect to sentencing factors.

## I. Factual Disputes

We take issue not just with the content but tone of the PSR. We view it as prosecutorial as opposed to neutral. Our generalized complaint would be remedied if the Court would announce that the facts which dictate the sentence come from the trial and resulting transcript. With that suggestion, we have condensed our factual claims:

| PSR Citation | Factual Dispute |
|---|---|
| ¶¶ 16, 88 | We dispute that there was a Ponzi scheme. Mr. Petters bought real companies, employed thousands, and added value to the community. A Ponzi scheme is a vessel empty of altruism. |
| ¶ 36 | This paragraph suggests a cynicism that Mr. Petters only donated money to enhance his image. We dispute that. His intentions in donating were rooted in grief and generosity. |
| ¶¶ 65-68 | Coleman is not an average participant. Nor Mr. White. Nor Reynolds. Nor Catain. |

| PSR Citation | Factual Dispute |
|---|---|
| ¶¶ 78, 94, 102 | We dispute the obstruction of justice points. Talk of flight was idle. Reynolds had no intention of going anywhere, he said. Mr. White wasn't about to sail his boat into the Atlantic and cross the sea to England. |
| ¶¶ 95-96, 106 | As noted below, there was no empirical basis for setting the Guidelines and the enhancements as they are now or were even in 1987 at inception. |
| ¶ 92 | We object to the finding that Mr. Petters jeopardized the safety and soundness of a financial institution. The collapse of Bell's funds had a superseding intervening cause, Bell himself. Mr. Petters did not have a relationship with the Chicago banks mentioned. |
| ¶¶ 92, 100 | We object to the four-level leadership increase, in light of the aiding-and-abetting theory the jury accepted. |
| ¶ 92, 101 | The abuse-of-trust points are not applied where, as here, the relationship is arm's length, commercial in nature. United States v. Hayes, 574 F.3d 460, 478 (8th Cir. 2009). |
| ¶ 88 | We object to the finding of over 250 victims. There was no testimony to that effect. |
| ¶¶ 106, 177 | For all of these reasons, we object to the finding of a base offense level of 55. Even if correct within the Guidelines' matrix, the number is without empirical basis. The Section 3553(a) factors provide a basis to disregard them and we will ask the Court to do so. |
| ¶¶ 190-192 | The PSR delineates no avenues of downward variance, leaving alone the grid's suggestion of life as an appropriate sentence, reserved in this District for the violent offender who ends an innocent life. |

## II. Section 3553(a) and Reasons For Downward Variance

Title 18, U.S. Code Section 3553(a) requires the Court to impose a sentence that is "sufficient, but not greater than necessary" to achieve the goals of sentencing. The range at best reflects only a "rough approximation" of what "might achieve Section 3553(a)'s objectives." Rita v. United States, 551 U.S. 338, 350 (2007). A downward variance has always been permitted if there are "mitigating circumstance[s] of a kind, or to a degree, not adequately taken into

consideration by the Sentencing Commission." U.S.S.G. § 5K2.0. But the weight and quality of those "circumstances" were restricted until three years ago, when the door of pure mercy opened—the Guidelines became advisory. United States v. Booker, 543 U.S. 220, 258-265 (2005).

The Court now "may vary [from the Guideline ranges] based solely on policy considerations, including disagreements with the Guidelines." Kimbrough v. United States, 552 U.S. 85, 101 (2007) (quotations and citations omitted). The judicial determination of the reasonableness controls over the Guidelines or any specific policy directive of Congress that may call for harsher sentences. Id. at 108-109.

This Court may draw any useful advice only if the Commission acted in "the exercise of its characteristic institutional role" when promulgating the Guidelines in question. Kimbrough, 552 U.S. at 109. That institutional role has two components: (1) reliance on empirical evidence of pre-Guidelines sentencing practice, and (2) review and revision of the Guidelines in light of judicial decisions, sentencing data, and comments from participants in the field. Rita, 551 U.S. at 351-352.

**A. Lack of Empirical Basis Re: Fraud Guidelines**

The Supreme Court recognized the Commission's institutional role that allowed it to "base its determinations on empirical data and national experience, guided by a processional staff with appropriate expertise." Kimbrough, 552 U.S. at 109 (citing United States v. Pruitt, 502 F.3d 1154, 1171 (10th Cir. 2007)

(McConnell, J., concurring)). After Kimbrough, this much has become axiomatic: if a Guideline was not developed based on this "empirical data and national experience," the District Court may conclude that it "yields a sentence 'greater than necessary' to achieve § 3553(a)'s purpose, even in a mine-run case." Id.

That conclusion is easy to reach here. "Nowhere in the forest of directives that the Commission has promulgated over the past decade can one find a discussion of the rationale for the particular approaches or definitions adopted by the Commission. . . . [N]or can one find any effort to justify that particular weight it has elected to assign various sentencing factors." Smith & Cabranes, Fear of Judging: Sentencing Guidelines in the Federal Courts at 56 (1998).

One source of disagreement has to do with the genesis of the Guidelines themselves. The suggested grid, called the heartland, "is comprised predominantly of mathematical averages of the sentences meted out in pre-Guidelines jurisprudence." Adam Lamperello, "Implementing the 'Heartland' Departure in a Post-Booker World," 32 Am. J. Crim. L. 133, 169-170 (2005). Derived of mere averages, the Guidelines were thus "divorced of principle, lacking in philosophical justifications, and silent as to why, and if so how, the particular sentencing ranges further any of the goals identified by Congress—retribution, deterrence, incapacitation, and rehabilitation." Id. at 170.

The question for this Court—whether the fraud grids and enhancements are based upon empirical data and the experience of national wisdom—has already been answered in the negative. By its own admission, the Commission has

historically increased sentences for economic crimes above past practice to achieve "short but definite periods of confinement for a larger proportion of these 'white collar' cases." U.S. Sentencing Commission, Fifteen Years of Guidelines Sentencing: An Assessment of How Well the Federal Criminal Justice System is Achieving the Goals of Sentencing Reform at 47 (2004) (hereinafter "Fifteen Year Report"). Since enactment in the mid-1980s, the Commission has amended the Guidelines in a singular direction, increasing hard-time sentences which are divorced from considerations of sound public policy and even from the commonsense judgments of front-line sentencing professionals who apply the rules. See Amy Baron-Evans, "The Continuing Struggle for Just, Effective and Constitutional Sentencing After United States v. Booker," 30 Champion 32, 34 (Oct. 2006). The increases have been due to real and perceived political pressure on the Commission, not empirical data. Fifteen Year Report at 56, 77.

The specific history of U.S.S.G. § 2B1.1 is illustrative. The first fraud guidelines established a base offense level of 4. For a loss over $5 million, the maximum loss set, thirteen levels were added. The highest white collar sentence level began at 17. U.S.S.G. § 2B1.1 (1987). Then Circuit Judge Stephen Breyer emphasized, without pause or objection, just how low and near a probation status the first white collar sanctions were. Breyer, "The Federal Sentencing Guidelines and the Key Compromises Upon Which They Rest," 17 Hofstra L. Rev. 1, 22 (1988).

Later increases were accomplished for the sake of increase. In the Economic Crimes Package of 2001, the Commission raised sentences for most mid to high-loss offenders. Fifteen Year Report at 56-57. In 2003 the base offense level for any fraud offense was increased yet again from six to seven, resulting in a 10% bump for all offenders, in turn restricting non-prison alternatives for 40% of fraud offenders at the lowest level. Both of these adjustments were accomplished without empirical data. Id.; see also Baron-Evans, supra at 34. They were also done in response to political pressure from the DOJ and Congress. Id. at 36. And it is because of political pressure (as opposed to empirical research) that the fraud guidelines produce sentences greater than necessary.

In light of these increases, two distinguished District Courts have found that (1) undue weight has been placed on the amount of monetary loss, and (2) the fraud guidelines have imposed cumulative enhancements for many closely related factors that, when combined, lead to guideline ranges that "have so run amok that they are patently absurd on their face." United States v. Parris, 573 F. Supp. 2d 744 (E.D.N.Y. 2008) (citing United States v. Adelson, 441 F. Supp. 2d 506, 515 (S.D.N.Y. 2006)).

These two factors bear discussion. The Guidelines have placed dead weight on financial loss without ever explaining why it is appropriate, let alone fair. Smith & Cabranes, supra, at 69. In many cases, including ours, loss is a "relatively weak indicator of the moral seriousness of the offense or the need for

deterrence." United States v. Emmenegger, 329 F. Supp. 2d 416, 427-428 (S.D.N.Y. 2004). Moreover, the fraud guideline uses "cliffs," the last being $400 million, which is the final and arbitrary drop-off point, likening a certain quantum of loss to a life sentence. The very existence of these cliffs, the Supreme Court has already held, is arbitrary. Kimbrough, 552 U.S. at 107.

In Adelson, the defendant was charged with securities fraud, causing false reports to be filed with the SEC, soliciting proxies through false statements, and conspiracy. 441 F. Supp. 2d at 506. Judge Rakoff reduced a guideline life sentence (Guidelines level 55) to 42 months based upon Section 3553(a) factors. Id. at 508.

After the Government appealed, the district court filed a Sentencing Memorandum with the Second Circuit, providing an analysis of how and why strict application of the fraud guidelines would have lead to an illogical result. Id. at 508. Judge Rakoff found that Mr. Adelson's offense level calculation was driven up by the "inordinate emphasis that the Sentencing Guidelines place in fraud cases on the amount of actual or intended financial loss." Id. at 509. He further held that the Guidelines impose cumulative enhancements for many closely-related factors that, when added together, unfairly skew what the right sentence should be. The Court wondered why, looked for an answer but could find none. "The [Sentencing] Commission has never explained the rationale underlying any of its identified specific offense characteristics, why it has elected to identify certain characteristics and not others, or the weights it has chosen to

assign to each identified characteristic." Id. at 510 (quoting Smith & Cabaranes, supra at 69).

Judge Rakoff warned of the "utter travesty of justice that sometimes results from the guidelines' fetish with abstract arithmetic, as well as the harm that guideline calculation can visit on human beings if not cabined by common sense." Id. at 512.

The Government appealed Mr. Adelson's sentence. The Second Circuit affirmed, holding that Judge Rakoff's decision to "impose a below Guidelines sentence was not a failure or refusal to recognize the guidelines, but rather a carefully considered reliance on Section 3553(a) factors." United States v. Adelson, 301 Fed. Appx. 93 (2nd Cir. 2008). That carefully considered decision changed the severity level from 55 to 21. This Court has the power to do just that.

In Mr. Petters' case, two additional offense levels have been suggested for abuse of a position of trust in facilitating the offense. Six more for over 250 victims, an extra four for role, and two more still for jeopardizing a financial institution even though Mr. Petters preferred to finance with individuals and hedge funds. Without an explanation as to why enhancement is worthy of points, we're left with a voodoo ceremony, placing point pins on Mr. Petters' prospective freedom. This one worth four, that one worth three, this one worth two until he is deflated, the process of pronouncing his proposed prison death artificial and demeaning.

In addition to Adelson, we suggest a close review of Parris, where the defendants were convicted of conspiracy and securities fraud. Multiple offense level enhancements were applied to the defendants' guidelines calculation including the amount of loss, the offense involved more than 250 victims, the offense involved sophisticated means, the defendants were officers or directors of a publicly-traded company, and the offense involved five or more participants. 573 F. Supp. 2d at 744, 750. The tally came to an offense level of 42, also a "draconian" result. Id. at 750. The District Court held that the guideline range—360-months to life—failed to reflect Section 3553(a) considerations. The Guidelines' (and this PSR's) "one-shoe-fits-all" approach to the offense characteristic enhancements were not fair. Id. at 755. Instead of life, Mr. Parris received 60 months. Id. at 750. The Government did not appeal.

The same reasons the High Court used to reverse the drug guidelines in United States v. Spears, 129 S. Ct. 840 (2009) and Kimbrough apply to the fraud provisions. The cocaine/crack/ecstacy guidelines were found to be arbitrary. So are the fraud guidelines.

Both sets of guidelines were written in response to the "tough on crime" theory of crowds and power. And both, Elias Canetti has told us, are hardly sacrosanct but rather should be evaluated for their undoubted fallibility. There is such a thing as "crowd instinct" which is always in conflict with "the personality instinct." The struggle between the two, Canetti has written, "can explain the course of human history." Canetti, The Memoirs of Elias Canetti at 387 (1999).

Mr. Canetti won the Nobel Prize in literature (1982) because he discerned one dialectic of civilization. The problem with the Guidelines, he would say, is that they reflect the crowd instinct to punish if not demonize the defendant at the expense of individual sanctity. It is a struggle the Supreme Court has taken up and has now resolved in the last five years in favor of Mr. Petters and all defendants like him.

**B. Factors Identified in Gall**

In addition to a lack of empirical basis behind the Guidelines (the PSR gives none), the Report does not discuss the most important sentencing case of them all, Gall v. United States, 552 U.S. 38 (2007). In Gall, the defendant received a probationary disposition (from a presumed 30-month sentence), because, inter alia:

- He had no record;
- His drug case did not involve a weapon, was non-violent;
- He submitted a bevy of character letters;
- He was in his early twenties;
- There was no evidence he would re-offend.

Gall, 552 U.S. at 40-41.

The Eighth Circuit's opinion reversing Mr. Gall's probationary disposition was in turn reversed. Our High Court found that the trial court's decision should have been accorded deference rather than what resembled a de novo review by the

Circuit. Id. at 55. The Supreme Court was also impressed with the lower court's finding that Mr. Gall's family would be fiscally and emotionally damaged by his incarceration and that imprisonment was not necessary to deter future behavior or to protect the public within the meaning of 18 U.S.C. § 3553(a). Id. at 58.

Gall affirmed rather pedestrian reasons for departure. Similar arguments—which have been made for the last two decades and repeatedly rebuffed by the United States and the Eighth Circuit—now possess a judicial imprimatur. The defense has long claimed a zero criminal history is significant beyond the zero assessed, for example. We've always argued that the Guidelines are suggestions only. Now we can say with confidence that Mr. Petters is more worthy of a break than Mr. Gall was:

- He is about thirty years older, and the lack of criminal history is of greater significance. Mr. Petters' only conviction, for a misdemeanor theft, was expunged.

- Mr. Petters' offense is a non-violent one. Mr. Gall's distribution of drugs was, by law, a crime of violence. United States v. Walker, 393 F.3d 819, 827 (8th Cir. 2005). Say what you will, Mr. Petters didn't kill anyone. The record in this district for points is 52, assessed against Buster Jefferson, who was convicted of killing five young children in a house fire. United States v. Jefferson, 215 F.3d 820 (8th Cir. 2000). The autopsy photographs in that case alone suggested a life term. At the time he was sentenced in 1999, just five defendants

in the United States had a higher guideline severity level. In Jefferson the victims were innocent. Here many of the investors indulged in the vice of greed.

- As with Mr. Gall, the empirical evidence suggests that Mr. Petters will not re-offend. Federal researchers have tracked the first time offender, discerning a recidivism rate of 6.8 percent. U.S. Guidelines Commission, Recidivism and the First Offender (May 2004). The rate decreases the older a defendant gets.

- The prison industry doesn't mention another secret. The Government never mentions this either. Social science research has compared recidivism rates for non-imprisoned and imprisoned offenders in the white collar setting. The rates are "about the same." Szockyj, "Imprisoning White-Collar Criminals?" 23 S. Ill. U. L.J. 485, 495 (1999). This finding undercuts any argument for a lengthy term. And Mr. Petters' chance of recidivism is even lower than the mean, given his rich and stable family structure, a key variable. See Wilson, The Moral Sense at 93-97, 141-163 (1993). His familial support has been unwavering.

- Mr. Petters, like Mr. Gall, was once the chief breadwinner for his family. The lack of his income has and will continue to hurt the innocent, particularly his two very young boys who were born out of grief and hope. The lack of a father figure in their lives for years on end is a victimization of the innocent, too. A long sentence will also renew the grief cycle for his daughter, who was left six years ago without a beloved brother. Her father's sentencing

ought not be Jenny's second visit to a funeral, accompanied by a speech of well of course you'll get over this, you can visit him in the prison in Timbuktu, and tomorrow you'll face the sunlight so chin up. This is not how life and death work.

> In the version of grief we imagine, the model will be "healing." A certain forward movement will prevail. The worst days will be the earliest days. . . . We have no way of knowing that the funeral itself will be anodyne, a kind of narcotic regression in which we are wrapped in the care of others and the gravity and meaning of the occasion. Nor can be know ahead of the fact (and here lies the heart of the difference between grief as we imagine it and grief as it is) the unending absence that follows, the void, the very opposite of meaning, the relentless succession of moments during which we will confront the experience of meaningless itself.

Didion, The Year of Magical Thinking at 188-189 (2005).

- The whole premise of the Guidelines is to provide just punishment and deterrence at once. Rita, 551 U.S. at 349. The value of deterrence for Mr. Gall and Mr. Petters is de minimis. Landmark research (which won a Nobel Prize) has found arguments that may be "logical" and "compelling" to predict behavior (here the threat of prison for others to see) are habitually ignored by individuals. Kahneman, Slovic & Tversky, Eds., Judgment Under Uncertainty: Heuristics and Biases at 116 (2nd ed. 2006) (citing Nisbett, Borgida, Crandall & Reed, Popular Induction: Information is Not Necessarily Informative). Indeed the Guidelines, by arbitrarily assessing the length of prison without taking into account the need for it, have "created a system in which cause and effect cannot be measured, which results in un-accountability." Osler, "Policy, Uniformity and Congress's Sentencing Acid Trip," B.Y.U. L. Rev. 293, 321 (2009).

- For Mr. Petters, perhaps unlike Mr. Gall, the deterrent value of the case has already reached fruition. Adverse media coverage has ruined his reputation and name. This case has received more attention than any other in Minnesota in the last ten years. The social science research has long confirmed that stigma remains one of the strongest inducements for an individual's change in behavior. See Goffman, Stigma: Notes on the Management of Spoiled Identity at 8-12, 23-25 (1983). In the white collar setting, "[w]hatever deterrence is gained may be produced before the imprisonment sanction is imposed." Weisburd et al., "Specific Deterrence in a Sample of Offenders of White Collar Crimes," 33 Criminology 585 (1995).

When economic and sociological models are applied to the standard reasons for high punishment—the chance of getting caught, an awareness of the penalties or, as here, a lack thereof, the commission of a crime in the face of consequences—the incentive of not committing a crime comes down to an "individualized consideration." Katyal, "Deterrence's Difficulty," 95 Mich. L. Rev. 2385, 2476 (1997).

In light of the research, the argument for Mr. Petters' long incarceration is circular and unpersuasive. "Others will be deterred even though Mr. Petters wasn't, and because he wasn't others will be." This is the same argument for high time used by the Enron prosecution, the Madoff prosecution, the Arthur Andersen prosecution, the soon-to-be Stanford prosecution and on the list goes, back in time to retired prosecutors who once though that their cases would be the end all, that

everything would change as a result of a verdict remembered forever. Such an argument and thought process is rooted in the grandiose, and there no logic in grandiosity, haughtiness, nor the sense of entitlement that a sentence should be, of course, what the Government wants.

- The argument for deterrence coupled with the need for incapacitation—Mr. Gall's or Mr. Petters'—has never had a statistical predicate either. The Bureau of Justice Statistics has tracked larceny and theft-based crimes since 1960. The rate for those crimes rose steadily until 1994, then declined, but then leveled without much change in the years since. The increases in the Guidelines since enactment do not correspond to a commensurate drop in larceny offenses from 2001 to 2006. Hence there is no evidence to suggest the ever increasing sentences in this area correlate to a drop in the crime rate.

The population figures—out and in custody—are also revealing. The population of the United States was 179,323,175 in 1960 and 307,006,550 as of July 2009, a 71% jump. See <http://www.census.gov/>. By comparison, the prisoners in custody in the United States have risen from 212,953 in 1960 to 1,233,159.00 in 2009, an increase of 500%. The number of defendants within the criminal justice system—either on probation, in jail, in prison or on parole—has risen from 1,842,100 in 1980 to 7,308,200 in 2008. See <http://bjs.ojp.usdoj.gov/content/glance/tables/corr2tab.cfm>.

With that level of penal sanction, one would expect an exponential drop in the crime rates. Yet the offenses feared the most—rape and murder—have

increased and decreased from year to year. See http://bjs.ojp.usdoj.gov/ dataonline/Search/Crime/State/StateCrime.cfm>.

What the Government's data suggest is that the gross uptick in incarceration of our population has not deterred violent crime. In light of the stable rates of rape and murder despite who is jail, the over-incarceration has not made the country safer. The statistics lead to the conclusion that we incarcerate not who we fear but who we are mad at, without any distinction between the two.

This creeping and pernicious tendency over the last forty years to increase and increase and increase sentences has resulted in a bulging prison population that could do well free and never offend again. The United States houses one fourth of the world's prisoners. As Senator Webb (Virginia) has observed, "With so many of our citizens in prison . . . there are only two possibilities. Either we are home to the most evil people in the world or we are doing something . . . vastly counterproductive." Newsweek at 17 (Feb. 2, 2010).

That counterproductive policy was noted decades ago. Observed one of the leading Guideline scholars (who recently passed): "The [Sentencing Guidelines] Commission has done nothing to constrain prison sentences within prison capacity limits" and it has "failed to implement the principle of parsimony in punishments that the ALI and ABA began espousing decades ago, and that Congress incorporated in the [Sentencing Reform Act]." Daniel J. Freed, "Federal Sentencing in the Wake of Guidelines: Unacceptable Limits on the Discretion of Sentencers," 101 Yale L.J. 1681, 1782 (1992).

The late District Court Judge Morris E. Lasker, of the Southern District of New York, complained about "what I call America's love affair with imprisonment." Lasker, "Prison Reform Revisited: A Judge's Perspective," 24 Pace L. Rev. 427 (2004). The Government's desire for a life sentence is rooted in "the play it safe protection of being 'tough on crime' as a formula for election (or evasion of defeat) by political office holders." Id.

Gall, Kimbrough, Rita and Spears reject this form of posturing and political sentencing, a sentencing for the Guidelines sake, a sentencing based upon another sentencing that was based on another, all without empirical roots.

### C. Additional Grounds for Downward Variance

#### 1. Conditions of Pretrial Confinement

Mr. Petters has been in custody since early October 2008. His jail in Elk River is well staffed. We're appreciative of their accommodations to counsel. But it's a dumping point warehouse funded by the federal government for lack of an alternative, a place sans incentive to provide anything beyond the basic rudiments.

Mr. Petters in particular has been held under much stricter conditions than most pretrial detainees there. For the first five months he was permitted no exercise. He has never been to the library. He is held in a small unit with eleven others. They share a TV, a shower, and a linoleum day room with no windows.

The Elk River time is much harder there than any prison Mr. Petters will be sent to. Several Judges of this District, e.g., Rosenbaum and Frank, have awarded double credit for that reason.

### 2. Physical Condition

The long-term prognosis for Mr. Petters' condition—a pituitary adenoma (or tumor)—is bleak; he faces the risk of blindness and paralysis. He should be placed in Rochester for that reason alone. The tumor is not growing at the moment, but cannot be ignored. His health is a recognized ground for departure. See United States v. Long, 977 F.3d 1264, 1277 (8th Cir. 1992) (Judge MacLaughlin's downward departure affirmed for reasons that the suggested imprisonment "would be the equivalent of a death sentence for Mr. Long").

### 3. Prison Stigma

Mr. Petters is a marked man in prison, vulnerable as a result of the national publicity he has incurred. United States v. LaVallee, 439 F.3d 670, 708 (10th Cir. 2006) (downward variance affirmed where defendant's adverse notoriety might cause him danger in the prison setting).

### 4. Generosity to Community

Mr. Petters' charitable and community activities are extraordinary. This, too, is a ground for downward variance. United States v. Woods, 159 F.3d 1132, 1136-1137 (8th Cir. 1998). We reject the government's claim, left unresolved by the jury, that Mr. Petters' activities had no heart.

### 5. Hedge Funds, Banks, and Lax Compliance

The victims' conduct contributed to the loss. Bell's customers, for example, had a right to a lock box, but did not require it. By requiring inordinate returns, the hedge funds and their investors assured themselves a failed business

model. Rates of 30-60% up to 80-300% were demanded by the undeterred. Mr. Petters was in many ways a pawn of the hedge fund industry, which was structured around accounts in the Grand Cayman Islands, required no due diligence, sold perverse risk and needed an avenue for unreasonable returns.

There was like failure of the financial sector and its regulators. All banks must file suspicious activity reports. 12 C.F.R. § 563.180; see also Rogers v. United States, 417 F.3d 845, 848 (8th Cir. 2005) (discussing the reports and why they are written). None were submitted to the Government, and nary a word of caution do we see in the other reports. The amount of money circulating through the Catain and Reynolds accounts was breathtaking. The banks made millions on the float and fees. None of the wire transfers would have been accomplished without their approval and profit.

**6. Cooperation**

With the Government's want of a life, a Section 5K1.1 motion will not be forthcoming. It should be. Mr. Petters, through counsel, provided the Government with a complete summary of the facts on November 24, 2008. The Government refused his offer of cooperation in favor of a three-week slide show, mouse-filled moments of document enlargement.

Mr. Petters' additional cooperation with authorities began from the get go. He turned over his passport; he voluntarily vacated his office; he agreed to the receivership both personal and corporate; he provided a listing of assets and assisted in the location of the same; he resigned from charitable and university

boards; he offered to cooperate with the SEC on matters of proof and location of assets; and he continues to cooperate with the Receiver to clawback assets. He met with the receiver and his representatives on February 3, March 2, and today March 8, for a total well over ten hours. And these meetings will continue no matter what the sentence. Ordinarily, the Government would rejoice.

The filing of cooperation motions has always been a subjective exercise, beyond review in most instances. Wade v. United States, 504 U.S. 181, 186 (1992). Adding to the fog, the Government doesn't have to even give a reason for the suggested departure or variance or the length thereof. United States v. Burns, 577 F.3d 887, 995 (8th Cir. 2009) (en banc). Since no mandatory minimum is in play, this Court is not constrained by the Government's motion. Id. at 897.

The upside of Burns to the defense is that the Government's preference vis-a-vis cooperation discounts may well be ignored. Id. This last Burns rule is a wise one. The Government's departure motion practice has long conveyed an implicit sense of superiority. It's reflected in the conceit that their arguments and decisions should determine the individual's sentence and not the Court. In wearing the white hat, that office has sometimes forgotten the defendant's view. He sees the rejection of cooperation as not only unfair but a form of condescension, a belittling. The many defendants who have cooperated and have not gotten the motion (because the prosecution feels it would be not right or unjust, or conflicts with a committee's policy) have come to an immutable conclusion: the "great antidote to morality is cynicism, which is nothing more than

an understanding of how arbitrary morality is, how unpredictable and unenforceable, how insecurely grounded in self-interest." Robinson, The Death of Adam at 170 (1998).

### 7. Similarly Situated Defendants

Sentences imposed upon similarly situated defendants likewise suggest far less time, a consideration of Section 3553(a). The leading example of fraud in Minnesota was the Midwest Federal Savings and Loan case, brought in the late 1980s. United States v. Olson, 22 F.3d 783 (8th Cir. 1994). The loss there was $1.2 billion dollars. United States v. Greenwood, Crim. No. 3-90-34 (D. Minn. 1992) (Docket No. 267, "Position of the United States with Respect to Sentencing Factors," at 20). Given inflation in the last twenty years, the loss in the Midwest Federal case exceeds the loss calculated by Pricewaterhouse here ($1.8 billion).

Harold Greenwood, the lead defendant and president of the Midwest Federal, received 42 months, served at the Duluth FCI. Mr. Greenwood's victims were depositors insured by the FDIC. The interest rates paid to them on savings accounts were minimal. Those were the pre-hedge fund days of reasonable expectation. Judge Magnuson decided, consistent with the research, that a "modest penalty" would suffice for Mr. Greenwood, serve justice and provide a deterrent. Frase, "Punishment Purposes," 58 Stan. L. Rev. 67, 75 (2005) (citing Tyler, Why People Obey the Law at 32, 64-68 (1990)).

Note, too, that back in the early 1990s, shortly after Mr. Greenwood was sentenced, the loss of $20 million was assessed a level 16. That same amount is

assessed 22 points today. Six points in the grid represents a doubling of the sentence. We challenge the Government to explain why Mr. Petters, who is responsible for a lesser loss, should serve a prison term that is an exponential of Mr. Greenwood's. Tell us what the empirical basis is. Please let us know.

This District's other high time cases are also illustrative by comparison. See United States v. Lefkowitz, 125 F.3d 608 (8th Cir. 1997) (25 years; unlike here the defendant's trial performance suggesting enormous recalcitrance); United States v. Smith, 573 F.3d 639 (8th Cir. 2009) (original 30 year sentence reduced to 20; Guidelines were life); United States v. Lewis, 557 F.3d 601 (8th Cir. 2009) (17 years where the Guidelines were life); United States v. Midkiff, No. 06-CR-407 (D. Minn. 2008) (15 years); United States v. Rubin, 836 F.2d 1096 (8th Cir. 1988) (defendant's 35-year sentence under pre-Guidelines system resulted in 12 years served).

Elsewhere, in United States v. Olis, 429 F.3d 540 550 (5th Cir. 2005), the Fifth Circuit reversed a 292-month sentence for failure to prove specific loss, and remanded for re-sentencing. Though the District Court determined the loss still high, a downward variance was warranted in light of the defendant's clean record, substantial letters of reference and because a "lengthy sentence" was not needed to deter Mr. Olis in the future. United States v. Olis, 2006 WL 2716048 at *13 (S.D. Tex. 2006). The sentence on remand of 72 months, the District Court held, would "provide deterrence against any potential criminal conduct." Id.

And in United States v. Forbes, 249 Fed. Appx. 233 (2nd Cir. 2007), the government described in its opening statement a $14 billion fraud. The defendant was convicted and required to pay restitution in excess of $3 billion. His prison sentence: 12 years, 7 months. A greater sentence here would be unjustified.

## III. Concluding Thoughts and Requests

With the collapse of the Guidelines as mandatory, sentencing has reverted to what it was pre-1986. When Judges engaged in the "practice of individualized punishments." Williams v. New York, 337 U.S. 241, 246-247 (1947). Mr. Petters is just as worthy for the nod of mercy as Mr. Greenwood was, Mr. Olin, Mr. Parris, Mr. Adelson, Mr. Smith, Mr. Lewis, and on the list goes back and forth in time.

We close with some final requests:

- Based on Mr. Petters' medical condition and proximity to family, we request designation at Rochester FMC.
- Mr. Petters would like to participate in the RDAP Program.
- We also request a "management variable" be recommended, permitting Mr. Petters to be housed at a camp facility even though his sentence may suggest a medium designation or higher. Well-known defendants who go to trial in this District seem to wind up in isolated locations without any reason. This Court should try to stop that practice.

[*Remainder of page intentionally left blank.*]

Dated: March 8, 2010 **__s/ Paul C. Engh____________________**

Paul C. Engh, MN #134685
Engh Law Office
220 South Sixth Street, Suite 215
Minneapolis, MN 55402
Telephone: (612) 252-1100

Jon M. Hopeman, MN #47065
Eric J. Riensche, MN #309126
Jessica M. Marsh, MN #388353
Felhaber, Larson, Fenlon & Vogt, P.A.
220 South Sixth Street, Suite 2200
Minneapolis, MN 55402-4504
Telephone: (612) 339-6321

Attorneys for Defendant Thomas J. Petters