# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

United States of America,

        Plaintiff,

                     Crim. No. 08-364 (RHK/AJB)
                     **MEMORANDUM OPINION
                     AND ORDER**

v.

Thomas Joseph Petters*,*

        Defendant.

---

James S. Alexander, Assistant United States Attorney, Minneapolis, Minnesota, for Plaintiff.

Christine N. Lindblad, David B. Galle, Marie L. van Uitert, Rebecca G. Sluss, Michelle R. Schjodt, Oppenheimer Wolff & Donnelly LLP, Minneapolis, Minnesota, for Petitioner Crown Bank.

---

## INTRODUCTION

Third party Crown Bank ("Crown") has filed Verified Petitions (Doc. Nos. 503, 505) under 21 U.S.C. § 853(n), asserting interests in two properties previously owned by Defendant Thomas Joseph Petters and forfeited to the United States as part of the criminal case against him.[1] Presently before the Court are the parties' cross-Motions for

---

[1] The statute permits "[a]ny person, other than the defendant, asserting a legal interest in property which has been ordered forfeited to the United States" to "petition the court for a hearing to adjudicate the validity of his alleged interest in the property." 21 U.S.C. § 853(n)(2). Such an "ancillary proceeding," which closely resembles a civil action, is governed by Federal Rule of Criminal Procedure 32.2(c).

Summary Judgment. For the reasons that follow, the Government's Motion will be denied and Crown's Motion granted.

## BACKGROUND[2]

### I. The underlying fraud and the Preliminary Order of Forfeiture

Petters was charged with wire fraud, mail fraud, money laundering, and conspiracy in connection with a large Ponzi scheme he orchestrated for more than a decade. Following a lengthy trial, he was found guilty in December 2009 on all 20 counts in the Superseding Indictment. He then waived his right to a jury determination whether forfeiture of certain property identified in the Superseding Indictment was appropriate.

On March 26, 2010, the Court issued a Preliminary Order (Doc. No. 395) forfeiting to the Government, *inter alia*, Petters's interests in two pieces of real property, one located at 320 Elk Circle, Dillon, Colorado (the "Keystone Property") and one located at 15823 50th Avenue North, Plymouth, Minnesota (the "Plymouth Property") (collectively, the "Properties"). The Court determined that the Properties "constitute[] or [were] derived from proceeds traceable to" wire and mail fraud and had been "involved in" money laundering, as each had been acquired using tainted funds. (Id. (citing 18 U.S.C. §§ 981-82).)

---

[2] As discussed below, the Court previously denied the Government's Motion to Dismiss the instant Petitions, see United States v. Petters, 857 F. Supp. 2d 841 (D. Minn. 2012) (Kyle, J.); familiarity with those prior proceedings, as well as the underlying criminal case, is presumed and will be repeated here only in limited fashion.

**II.    The Verified Petitions and the Motion to Dismiss**

On October 20, 2011, Crown filed Verified Petitions with this Court under 21 U.S.C. § 853(n) and Federal Rule of Criminal Procedure 32.2, asserting interests in the Properties. It alleged that it had loaned Petters money under a line of credit and on September 25, 2008, in consideration for funds previously advanced, he had executed in the bank's favor a mortgage on the Plymouth Property and a deed of trust for the Keystone Property. (Doc. No. 503, ¶ 2(c); Doc. No. 505, ¶ 2(c).) Accordingly, it alleged that it was a bona fide purchaser for value of its Property interests, and as a result it sought an Order amending the Court's Preliminary Order of Forfeiture to reflect those interests.

The Government responded by moving to dismiss the Verified Petitions. It argued that Crown was not a bona fide purchaser for value because it had obtained its Property interests as security for pre-existing debt. (See Doc. No. 530 at 7-8.) It also argued that Crown could not prevail because it "knew, or should have known, that the . . . [P]roperties were subject to forfeiture" when its interests arose. (Doc. No. 522 at 20 n.2.)

On April 24, 2012, the Court denied the Government's Motion. United States v. Petters, 857 F. Supp. 2d 841 (D. Minn. 2012) (Kyle, J.). It concluded that "acquiring an interest in property as security for an antecedent debt," as Crown had done here, "is a bona fide purchase for value." Id. at 847. It also concluded that the record was too undeveloped at the pleading stage to determine whether Crown could (or could not) prevail on its Petitions. Id. ("The Court simply cannot tell at this juncture what Crown knew . . . about Defendant's fraud, and little in the way of evidence has been submitted

on that question. Accordingly, the Court determines that it cannot dismiss the Verified Petitions with regard to the Keystone and Plymouth Properties on this basis at the present time."). The parties were therefore ordered to develop a plan for discovery and the filing of dispositive motions. See Fed. R. Crim. P. 32.2(c)(1)(B) (before determining merits of third-party petition, court "may permit the parties to conduct discovery," and "[w]hen discovery ends, a party may move for summary judgment under Federal Rule of Civil Procedure 56").

## III. The circumstances surrounding Crown's Property interests

Following the Court's Order, the parties undertook discovery regarding Crown's interests in the Properties, which revealed the following undisputed facts:

From 2002 to 2008, Crown loaned money to Petters through an unsecured credit line. The original line provided him with credit of up to $500,000, but over the years the limit was steadily increased to $2,250,000. Petters's primary contact at the bank was Kevin Howk, the President of its Edina branch, with whom he had maintained a banking relationship since the 1990s (when Howk worked at a different bank).

Crown renewed the credit line on an annual basis, and in August 2008 it was again up for renewal. At the time, the line was fully extended, that is, the balance due was $2,250,000. In connection with the renewal, Petters provided Howk with information regarding his assets, financial condition, and business activities, and Howk in turn prepared a loan "write up" (also called a "credit display") to be presented to the bank's loan committee for approval. The write up noted Petters's position as CEO of Petters Group Worldwide ("PGW") and its affiliated companies, including Polaroid, Sun

Country Airlines, and Fingerhut. It also noted the substantial assets held by Petters, including $29 million in cash and marketable securities and real estate valued at more than $20 million, as well as the longstanding relationship between Petters and Howk. The write up recommended that the credit line be renewed; that recommendation was adopted on September 9, 2008.

Approximately two weeks later, on September 24, 2008, dozens of law-enforcement officers raided PGW's headquarters. Howk's mother-in-law called him late that morning and reported "a whole lot" of police cars at Petters's offices. Howk called Petters on his cell phone and reached him in Las Vegas; he was "agitated" and reported that the raid was nothing to be concerned about and had resulted from an employee being investigated for embezzlement.

After speaking with Petters, Howk contacted Peter Dahl, Crown's CEO, who directed him to try to obtain collateral for the credit line. Dahl was concerned because the line was unsecured and the bank could not be sure whether the raid indicated that others might make a claim to Petters's personal assets. Howk, too, was concerned that the so-called embezzlement could affect Petters's ability to repay the credit line, and collateral would provide extra security to the bank. Howk then telephoned Petters and demanded collateral, and Petters indicated that he owned two pieces of unencumbered real estate that he could pledge. Howk asked for additional details about the properties, which Petters agreed to provide. Howk also asked to meet with Petters the following day, upon his return to Minnesota, and Petters agreed.

The raid at PGW was widely reported in the media. Howk saw a televised news broadcast about it the morning it occurred, although scant details were provided. Another report aired on Minnesota Public Radio later that afternoon. That report, as well as an article published in the Minneapolis *Star Tribune* the following morning (September 25, 2008), indicated that Petters's home had been searched in connection with the Government's investigation into a "multi-billion dollar fraud," but Petters maintained he was not involved in any wrongdoing. In addition, on September 25, 2008, Howk was served with a grand jury subpoena seeking all of Crown's records since 2002 regarding Petters and one of his companies (Petters Company, Inc. ("PCI")).

At approximately 4:00 p.m. on September 25, 2008, Howk traveled to PGW, where Petters signed a deed of trust and mortgage granting Crown first priority interests in the Keystone and Plymouth Properties, respectively, as security for funds advanced under the credit line. Petters reiterated at that time that the raid concerned embezzlement by a specific employee, and he denied being personally involved in any criminal activity. On Friday, September 26, 2008, Crown sent the deed of trust and mortgage via Federal Express to be recorded in their respective jurisdictions. Each was recorded the following Monday, September 29, 2008.

In the interim, several more news reports were published regarding the raid, some of which indicated that the Government believed Petters was involved in a massive fraud scheme. In addition, Petters contacted Howk and asked him to redeem $390,000 in certificates of deposit he held at Crown (either individually or through his businesses) and wire the funds to prominent local criminal-defense attorney Jon Hopeman. Petters

claimed he "needed the money for his attorney." On September 29, 2008, the *Star Tribune* reported that Petters had resigned as Chairman and CEO of PGW and its affiliated companies. He was arrested four days later, and his assets were frozen pursuant to an order from this Court. The Government filed notices of *lis pendens* against the Properties in November 2008, indicating its intention to forfeit them as the proceeds of fraud.

Based on the foregoing facts, the parties now cross-move for summary judgment on the forfeitability of Crown's interests in the Properties. The Motions have been fully briefed, and the Court heard oral argument on January 9, 2013. The Motions are now ripe for disposition.

## STANDARD OF REVIEW

Summary judgment is proper if, drawing all reasonable inferences in favor of the nonmoving party, there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). The moving party bears the burden of showing that the material facts in the case are undisputed. Id. at 322; Whisenhunt v. Sw. Bell Tel., 573 F.3d 565, 568 (8th Cir. 2009). The Court must view the evidence, and the inferences that may be reasonably drawn from it, in the light most favorable to the nonmoving party. Weitz Co., LLC v. Lloyd's of London, 574 F.3d 885, 892 (8th Cir. 2009); Carraher v. Target Corp., 503 F.3d 714, 716 (8th Cir. 2007). The nonmoving party may not rest on mere allegations or denials, but must show through the presentation of admissible evidence that specific facts exist creating a genuine issue for trial. Anderson v. Liberty

Lobby, Inc., 477 U.S. 242, 256 (1986); Wingate v. Gage Cnty. Sch. Dist., No. 34, 528 F.3d 1074, 1078-79 (8th Cir. 2008).

Where, as here, the Court confronts cross-motions for summary judgment, this approach is only slightly modified. When considering the Government's Motion, the Court views the record in the light most favorable to Crown, and when considering Crown's Motion, the Court views the record in the light most favorable to the Government. "Either way, summary judgment is proper if the record demonstrates that there is no genuine issue as to any material fact." Seaworth v. Messerli, Civ. No. 09-3437, 2010 WL 3613821, at *3 (D. Minn. Sept. 7, 2010) (Kyle, J.), aff'd, 414 F. App'x 882 (8th Cir. 2011) (*per curiam*).

## ANALYSIS

The criminal forfeiture statute provides that all right, title, and interest in property subject to forfeiture "vests in the United States upon the commission of the act giving rise to forfeiture." 21 U.S.C. § 853(c). Thus, after a crime has been committed, "title to the forfeitable property, by operation of the relation-back clause, actually belongs to the government." United States v. Huntington Nat'l Bank, 682 F.3d 429, 433 (6th Cir. 2012) (citation omitted). Congress, however, carved out two exceptions to this relation-back rule, found in 21 U.S.C. § 853(n)(6), to protect the rights of certain innocent third parties. See United States v. White, 675 F.3d 1073, 1081 (8th Cir. 2012) (noting that a third party "cannot prevail . . . unless [it] qualifies for relief under one of the two prongs of § 853(n)(6)"). It is the second of these exceptions that is at issue here.

Under 21 U.S.C. § 853(n)(6)(B), a property interest cannot be forfeited if "the petitioner is a bona fide purchaser for value of the . . . interest . . . and was at the time of purchase reasonably without cause to believe that the property was subject to forfeiture under this section." The purpose of this provision is "to protect innocent purchasers who acquire property without notice of the government's superior interest – acquired through the operation of the relation-back doctrine – in the forfeited property." Huntington Nat'l, 682 F.3d at 436. To invoke this exception here, Crown must show that (1) it has legal interests in the Properties, (2) the interests were "acquired as a bona fide purchaser for value," and (3) the interests were acquired "at a time when [Crown] was reasonably without cause to believe that the [Properties were] subject to forfeiture." White, 675 F.3d at 1081.

The first two elements are not in dispute – the Government acknowledges that Crown enjoys legal interests in the Properties by virtue of the mortgage and deed of trust, and the Court has already determined that Crown was a bona fide purchaser for value of those interests. United States v. Petters, 857 F. Supp. 2d at 846-47. At issue, then, is the third element: whether Crown was "reasonably without cause" to believe the Properties were subject to forfeiture at the time its interests arose. As the word "reasonably" implies, this is analyzed using an objective standard. See, e.g., United States v. King, No. 10 Cr. 122, 2012 WL 2261117, at *8 (S.D.N.Y. June 18, 2012); United States v. Brown, 509 F. Supp. 2d 1239, 1246 (M.D. Fla. 2007). According to the Government, the facts detailed above demonstrate that Crown cannot meet this standard here. The Court does not agree.

At the outset, the parties dispute the date on which Crown's Property interests were established. The Government contends that the interests "did not vest until Monday September 29, 2008, the date the [mortgage and deed of trust] were recorded." (Gov't Mem. at 24.) It argues that the Plymouth Property is Torrens property and "[n]o interest in Torrens property arises unless and until the conveyance document is recorded." (Id.)[3] Similarly, it argues that under Colorado law, Crown "did not acquire any rights vis-a-vis the government as to the [Keystone] property until it recorded its deed of trust." (Id. at 25.) Crown responds that its interests arose several days earlier, on September 25, 2008, when Petters executed the mortgage and deed of trust in its favor. (Crown Mem. at 17-21.)[4] In the end, the Court finds these arguments irrelevant because, assuming *arguendo* that Crown's interests did not arise until September 29, 2008, the record does not create a genuine issue that Crown "reasonably [had] cause to believe" the Properties were subject to forfeiture on that date.

It is undisputed that Crown lacked *actual* knowledge the Properties were forfeitable when its interests arose. Howk and Dahl each denied knowing the Properties were obtained with fraud proceeds or were otherwise subject to forfeiture, assertions that the Government does not challenge. Nor is there any suggestion by the Government that other Crown employees knew of (or suspected) the possibility of forfeiture. Instead, the

---

[3] Minnesota recognizes two types of real property: abstract and Torrens property. The distinction between them is discussed in detail in In re Collier, 726 N.W.2d 799 (Minn. 2007).

[4] Contrary to Crown's argument (see Crown Mem. in Opp'n at 4), the Court did not conclude, when denying the Government's Motion to Dismiss, that September 25, 2008, is the operative date. This issue was not raised in the parties' prior briefing, and the Court mentioned September 25, 2008, in its earlier Order only because it was (and remains) undisputed that Petters executed the mortgage and deed of trust on that date.

Government argues that Crown's lack of *actual* knowledge is immaterial, because the bank was "*objectively* on notice of the conduct giving rise to forfeiture based on facts that it knew or should have known." (Gov't Mem. at 25.) In support, it primarily relies upon the media reports surrounding execution of the search warrants and the underlying criminal investigation.

Some courts have, indeed, recognized that media reports are relevant when evaluating a third party's knowledge of forfeitability. See, e.g., United States v. BCCI Holdings (Luxembourg), S.A., 961 F. Supp. 287, 296-300 (D.D.C. 1997). But in the Court's view, the Government ascribes too much significance to such reports here. In BCCI Holdings, 105 newspaper articles published over nearly three years described in detail the criminal conduct in question, "including [BCCI's] guilty plea to money laundering charges." Id. at 290 & n.3; see also United States v. Timley, 507 F.3d 1125, 1131 (8th Cir. 2007) (attorney failed to show he was reasonably without cause to believe funds were subject to forfeiture where he accepted funds after defendant was indicted for fraud). This stands in stark contrast to the situation here, where the media reports, though numerous, spanned a few short days, while the situation with Petters and his companies was still evolving. Crown was under no obligation to accept those reports at face value, as stories in the media (particularly "breaking news") often are inaccurate and paint a one-sided picture of events. Indeed, this is precisely why trial jurors are instructed to disregard newspaper articles, radio broadcasts, and other media accounts. See, e.g., 8th Cir. Manual of Model Jury Instructions, Criminal, §§ 1.03, 1.08, 2.01 (2012). Further, many of the reports indicated that Petters had repeatedly denied involvement in criminal

activity, as he had done to Howk, and in fact he was not charged (and his assets were not frozen) until October 3, 2008, well after Crown's interests in the Properties arose. Cf. King, 2012 WL 2261117, at *8 (attorney had reason to know funds were subject to forfeiture when, on date his interest arose, defendant had already been indicted and litigation had been commenced alleging funds were embezzled); BCCI Holdings, 961 F. Supp. at 290 (assets frozen, and asset-freeze publicized, before property interest arose).

The Government notes that Dahl and Howk "raced" to obtain security for the credit line because "they knew Petters' assets could be subject to claims from other creditors." (Gov't Mem. at 28.) But seeking protection from "other creditors" is a far cry from knowing that assets are *the proceeds of fraud* and *subject to criminal forfeiture*. Indeed, the Court finds it noteworthy that the Government did not file its notices of *lis pendens* on the Properties until November 2008. If it were so obvious that the Properties were forfeitable in September of that year, why did the Government wait to file its notices of *lis pendens* until almost two months later?[5]

More critically, the Government's arguments fail because they are suffused with generalities about Petters's fraud, divorced from the specific Properties at issue here. The bona fide purchaser defense turns on knowledge that *specified property* is subject to forfeiture; generalized knowledge of fraud is not enough. See 21 U.S.C. § 853(n)(6)(B)

---

[5] At oral argument, the Government suggested it could not have filed the notices of *lis pendens* earlier because it first had to undertake a detailed tracing analysis linking Petters's fraud to the Properties. But this simply underscores the point: if the Government could not determine sooner that the Properties were obtained with fraud proceeds, why should Crown have been able to do so? After all, the Government was in far better position to ascertain which of Petters's assets were subject to forfeiture, seeing as it had access to a cooperating witness (a Petters insider) who had explained in detail the precise nature and extent of the fraud.
- 12 -

(petitioner prevails if "at the time of purchase" it was "reasonably without cause to believe that *the property* was subject to forfeiture under this section") (emphasis added). In other words, evidence tending to show that Crown should have known Petters was engaged in fraud will not suffice. Rather, the evidence must show that Crown should have known *the Keystone and Plymouth Properties* were obtained with fraud proceeds – and, hence, forfeitable – when its interests arose. See <u>United States v. An Interest in the Real Property Located at 2101 Lincoln Blvd.</u>, 729 F. Supp. 2d 1150, 1157 (C.D. Cal. 2010) ("[T]he court's focus is on whether the purported innocent owner had reason to know of *the connection between the crime and the property*.") (emphasis in original). Yet, the Government has made little (if any) effort to link Crown's so-called "knowledge" to the Properties in question here, and neither the media accounts, the search warrants, nor the grand jury subpoena made any mention of the Properties.

Further, while much (if not most) of Petters's operation was a sham, there does not appear to be any dispute that certain of his companies (including Sun Country and Polaroid) did, in fact, perform legitimate business. Hence, even if the information available to Crown should have raised red flags, the Government has not explained why the bank should have concluded the Properties were purchased with tainted funds rather than from legitimate business operations. See <u>United States v. Reckmeyer</u>, 836 F.2d 200, 204-05 (4th Cir. 1987) ("A reasonable person with the knowledge the government attributed to [Crown] would not necessarily conclude that *all property* owned by [Petters] was forfeitable. . . . Understandably, [Crown] may not necessarily have assumed the worst from the limited information available to [it].") (emphasis added); <u>United States v.</u>

392 Lexington Parkway S., 386 F. Supp. 2d 1062, 1065, 1068 (D. Minn. 2005) (Kyle, J.) (bank qualified as innocent owner despite fact that defendant executed mortgage on property *after* being indicted for drug trafficking, home had been searched by police for illegal narcotics, and drugs had been found there). Even if Crown should have suspected that something was amiss, it simply requires too great a leap to conclude that the bank should have known *these particular Properties* were obtained through fraud.[6]

The Government also argues that Crown is a sophisticated entity, well positioned to "conduct a reasonable investigation before acquiring [its] interest in the" Properties, yet it "did not ask any questions or conduct any investigation to determine whether the properties could be linked with a multi-billion dollar fraud scheme." (Gov't Mem. in Opp'n at 12.) But while willful blindness enjoys no shelter under Section 853(n), the Court wonders how reasonable it would have been for Crown to ask a customer – by many accounts, its *best* customer – whether he was engaged in a giant Ponzi scheme, or better yet what kind of answer it would be likely to receive to that question.[7] Regardless, the Court disagrees with the Government's suggestion that Section 853(n) imposes a "duty of inquiry." As the Seventh Circuit explained in United States v. Frykholm, 362

---

[6] The Government posits that Crown had "reason for concern" even *before* the search warrants were executed, based on a large, unexplained withdrawal ($25 million) Petters had made from the bank in early September 2008. (Gov't Mem. at 27.) But the Government offers no persuasive reason why this withdrawal should have raised red flags. Indeed, it acknowledges that tens of millions of dollars passed through Petters's (and his companies') accounts at Crown over the years, all without suspicion – by the bank, by federal regulators, by law enforcement, or by anyone else – that fraud was taking place. (Gov't Mem. in Opp'n at 10-11.)

[7] At oral argument, the Government noted that the bank had access to Petters insiders, but there is no reason to believe those insiders would have provided any different answers to such an inquiry than Petters himself.

F.3d 413, 416 (7th Cir. 2004) (emphasis added), "the principal function of the bona-fide-purchaser doctrine is to protect buyers that *did not investigate*, and reading § 853(n)(6)(B) to require investigation as a condition of being an innocent purchaser would all but vitiate the statute's goal of protecting persons who meet state-law definitions of bona fide purchasers for value."  See also United States v. Lavin, 942 F.2d 177, 186 (3rd Cir. 1991) ("Section 853(n)(6)(B) . . . remov[es] an impediment to commercial transactions – to wit, the need for a purchaser to engage in exhaustive research, in order to discover whether there are competing claims to the property, prior to consummating a sale.").

Lastly, the Government notes that where, as here, restitution has not been ordered by the Court, forfeiture is "the primary means available to the United States to recover criminal proceeds that can be used to compensate victims."  (Gov't Mem. in Opp'n at 2.)  This is no doubt true, but the Court simply cannot ignore Section 853(n) as it sees fit in order to dispense what it (or the Government) perceives as "justice" under the circumstances.  More importantly, this argument ignores that Crown, too, is a victim of Petters's Ponzi scheme – a victim that Section 853(n) was designed to protect.

**CONCLUSION**

With the benefit of hindsight, the Government's arguments take on a thin veneer of persuasiveness.  But hindsight, of course, "is always 20/20."  United States v. Moran, 393 F.3d 1, 10 (1st Cir. 2004).  When viewing the evidence in the light most favorable to the Government, the Court concludes that Crown has shown, by a preponderance of the evidence, that it was "reasonably without cause to believe that the [Properties were]

- 15 -

subject to forfeiture" when it acquired its interests therein. 21 U.S.C. § 853(n)(6)(B). Accordingly, it is entitled to have those interests preserved.

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS ORDERED** that Crown's Motion for Summary Judgment (Doc. No. 553) is **GRANTED** and the Government's Motion for Summary Judgment (Doc. No. 554) is **DENIED**. The Court's Preliminary Order of Forfeiture is hereby **AMENDED** to exclude from its reach Crown's interests in the Plymouth and Keystone Properties (Doc. No. 395, ¶¶ 1(b), 1(d), 2(b), 2(d)).

**LET JUDGMENT BE ENTERED ACCORDINGLY**.


Date: January 24, 2013                    s/Richard H. Kyle
                                          RICHARD H. KYLE
                                          United States District Judge